UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IDA WILLIAMS,

        Plaintiff,

v.

MACOMB-OAKLAND REGIONAL
CENTER,

        Defendant.
_____/

No. 06-14127

District Judge Paul V. Gadola

Magistrate Judge R. Steven Whalen

## **REPORT AND RECOMMENDATION**

Before the Court is Defendant Macomb-Oakland Regional Center's *Motion for Summary Judgment* pursuant to Fed. R. Civ. P. 56(c) [Docket #66], which has been referred for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B). For the reasons set forth below, I recommend that Defendant's motion be GRANTED, dismissing this case with prejudice.

## **I. BACKGROUND FACTS**

On September 19, 2006, Plaintiff, an adult foster care provider, filed the instant action under 42 U.S.C. §1981, alleging violations of her civil rights regarding her contract with Defendant ("MORC") to provide foster care for developmentally disabled adults. Plaintiff's Amended Complaint [Docket #52], filed on July 2, 2007, also alleges civil rights violation pursuant to 42 U.S.C. §2000e *et seq*.

Plaintiff, an African-American female, alleges that on October 10, 2005, she applied to MDHS licensing consultant John Pochas to treat developmentally disabled individuals. *Amended Complaint,* at ¶11. On Ocotber 13, 2005, Plaintiff received a temporary license to run an in-home adult foster care facility. *Id*. at ¶12. On November 30, 2005, Defendant's

employees Margot Bloomfield and Karen Hollingsworth conducted an inspection of Plaintiff's home. *Id.* at ¶15. Plaintiff, alleging that the inspection was "cursory," also alleges that Defendant's employees "failed to bring any of the MORC contract documents that had been promised for [her] review." *Id.* at ¶16. Plaintiff alleges that on December 1, 2005, she "sent correspondence to Defendant's employees" objecting to their "manner of treatment" and demanding an explanation as to why they had inspected her home "without any apparent business justification." *Id.* at ¶19.

Plaintiff alleges that on January 10, 2006, she filed a complaint with the Equal Employment Opportunity Commission ("EEOC"), claiming that Defendant and its employees discriminated against her. *Id.* at ¶21. Defendant responded to the EEOC complaint, denying discrimination, but nonetheless contacted Plaintiff on February 17, 2006, informing her "that a foster home for [] two consumers was needed," [Robert Moore and LaRhonda Gray] offering Plaintiff a contract. *Id.* at ¶¶22-24. Plaintiff, alleging that at the time she was one of only five African-American MORC providers out of a pool of 209, claims that Defendant did not inform her of the "past mental and psychiatric histories of the two patients she was assigned." *Id.* at ¶¶25-26. Plaintiff alleges that her tenure with Defendant was marked by Defendant's "inattention" to her requests for medical and psychiatric services for the residents as well as a refusal to reimburse her for expenses incurred in her role as care giver. *Id*. at ¶¶27-28. On April 7, 2006, Plaintiff filed a complaint with the Oakland County Community Mental Health Authority Office of Recipient Rights "against the employer of one of Plaintiff's developmentally disabled residents, submitting a copy to Defendant." *Id.* at ¶29. The complaint was dismissed on May 3, 2006. *Id.* at ¶31. She alleges that On April 19, 2006, she filed a second complaint against Defendant with the EEOC, "alleging discrimination, retaliation and discriminatory

impairment of contract." *Id.* at ¶30. She states that on June 27, 2006, "both EEOC complaints filed by Plaintiff were dismissed." *Id*. at ¶33. The Amended Complaint states further that on August 22, 2006, Plaintiff informed Defendant's representatives and John Pochas that "dangerous and violent behavior" was being exhibited by one of her residents [Robert Moore], obliging her "to call 911." *Id.* at 34. Plaintiff alleges that "[s]hortly after the . . . incident," she submitted a Michigan Family Independence Agency incident report and a petition for hospitalization. *Id.* at ¶35. On August 23, 2006, Defendant terminated Plaintiff's contract, effective immediately. *Id.* at ¶36.

Defendant's account of the August 22, 2006 incident differs somewhat from Plaintiff's, alleging as follows. On August 22, 2006, Plaintiff called MORC, informing staff that she had called 911 and that Moore had been taken to St. Joseph Hospital and she would not allow Robbie to be returned to her facility under any circumstances. *Defendant's Brief, Docket #66* at 7. MORC's Health-Safety and Accreditation Manager, on call that evening, informed Plaintiff that "her refusal to take [Moore] back into the facility constituted a breach of her Contract." *Id*. at 7-8; Exhibit Z. Moore, after being discharged the same evening, "was homeless due to Plaintiff's refusal to return him to her home while alternat[ive] placement could be found." *Id*. at 8. Moore was forced to spend the night at a shelter. *Id*. LaRhonda Gray's guardian, fearing that her ward would also be summarily expelled by Plaintiff, had Gray removed from Plaintiff's facility the next day. *Id*., Exhibit B at ¶28.

The Amended Complaint alleges that Defendant violated Plaintiff's rights under Title VII of the Civil Rights Act of 1964 by discriminating against her on the basis of race and national origin. *Amended Complaint* at ¶¶38-47. She also claims that Defendant retaliated against her for complaining about its "discriminatory practices." *Id*. at ¶58. She alleges "loss of earnings, earning capacity and fringe benefits" as well as mental anguish, physical and

emotional distress, humiliation, mortification and embarrassment," and "loss of professional reputation." *Id*. at ¶57. Plaintiff seeks compensatory, punitive, and exemplary damages; attorneys' fees; and reinstatement of her former position.

## II. STANDARD OF REVIEW

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). To prevail on a motion for summary judgment, the non-moving party must show sufficient evidence to create a genuine issue of material fact. *Klepper v. First American Bank*, 916 F.2d 337, 341-42 (6th Cir. 1990). Drawing all reasonable inferences in favor of the non-moving party, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celetox Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact, and summary judgment is appropriate. *Simmons-Harris v. Zelman*, 234 F.3d 945, 951 (6th Cir. 2000).

## III. ANALYSIS

Defendant submits multiple arguments in favor of summary judgment. First,

Defendant argues that Plaintiff's Title VII allegation that it discriminated against her in her capacity as an employee is dismissible for the obvious reason that she was an independent contractor, rather than an employee. *Docket #66* at 9. Second, Defendant contends next that even if Plaintiff is deemed an employee, the complaint's claim of discrimination on the basis of national origin fails on the basis that she did not include this allegation in her EEOC charges. *Id*. at 11. On a related note, Defendant argues third that Plaintiff's "national origin" claim is non-cognizable under 42 U.S.C. §1981. *Id.* at 12-13. Defendant argues fourth that Plaintiff has presented neither direct nor indirect evidence to support a Title VII or §1981 racial discrimination claim. *Id*. at 13-16. Fifth, Defendant contends that even assuming the presence of a *prima facie* case of discrimination on the basis of indirect evidence, it can show legitimate, non-discriminatory reasons for its actions. *Id.* at 16-18. Sixth, Defendant argues that Plaintiff's inability to establish a causal connection between her EEOC complaints and the alleged adverse action is fatal to her retaliation claim. *Id.* at 18.

**A. Plaintiff Has Failed to State a Claim under Title VII**

Defendant argues that Plaintiff's Title VII claims fail on the basis that she was not an employee. *Defendant's Brief* at 9. Citing *Christopher v. Stouder Memorial Hospital*, 936 F.2d 870, 877 (6th Cir. 1991), Defendant contends that Plaintiff's status as an independent contractor rather than an employee precludes recovery under Title VII. *Id.*

*Christopher v. Stouder,* 936 F. 2d at 877 (*citing Falls v. Sporting News Pub. Co.*, 834 F.2d 611, 613 (6th Cir.1987)) notes that "while the term 'employee' is to be construed broadly in Title VII, it is not meant to reach independent contractors." *Falls,* 834 F.2d at 613, states:

> "Although this court has rejected a narrow construction of the term 'employee' under both Title VII and the ADEA, it has nevertheless adhered to a standard that would exclude from the protection of either act a person who cannot be

considered an employee, but is instead clearly an independent contractor."

Defendant contends that determining whether Plaintiff is an employee or independent contractor requires applying an "economic reality" test. *Defendant's Brief* at 10 (*citing Falls*, at 614). However, *Shah v. Deaconess Hosp.*, 355 F.3d 496, 499 (6th Cir. 2004) notes that "in more recent cases, we have made it clear that we prefer the common law agency analysis," noting that "substantive differences between the two tests are minimal." Among the factors to be considered:

> "the hiring party's right to control the manner and means by which the product is accomplished; the skill required by the hired party; the duration of the relationship between the parties; the hiring party's right to assign additional projects; the hired party's discretion over when and how to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the hiring party's regular business; the hired party's employee benefits; and tax treatment of the hired party's compensation."

*Shah*, at 499-500.

An examination of these factors shows that Plaintiff is not an employee for purposes of Title VII. Plaintiff acknowledged at deposition that her contract with Defendant states that she was an independent contractor. *Docket #66*, Exhibit E at pg. 167; *See also* Exhibit S at §12.1. Plaintiff admitted that Defendant did not withhold taxes from her payments, issue a W-2 form, or give her health or dental benefits. *Id.* at pgs. 168-170. She also admitted that she chose the name of her business and was "free to contract with other organizations." *Id.* at pg. 171. Plaintiff acknowledged that she was free to hire people, enjoying "total autonomy over her facility." *Id.* at pgs. 171, 173. Both of Plaintiff's EEOC complaints were dismissed on the basis that "[n]o employee-employer relationship" existed between Defendant and Plaintiff. *Id.*, Exhibits R, T. Accordingly, Plaintiff's claim for relief under Title VII should be dismissed.

### B. Plaintiff's Title VII "National Origin" Claim Should be Dismissed.

Plaintiff's failure to show that she was an employee, as discussed *supra*, forecloses her Title VII claim altogether. Hence, whether Plaintiff is entitled to pursue a "national origin" claim is a moot point. Nonetheless, Defendant contends that even if assuming that Plaintiff is deemed an employee under Title VII, because her EEOC charges omitted a claim of discrimination on the basis of national origin, this Court has no subject matter jurisdiction over this claim. *Id*. at 11.

"Federal courts do not have subject matter jurisdiction to hear Title VII claims unless the claimant explicitly files the claim in an EEOC charge or the claim can reasonably be expected to grow out of the EEOC charge." *Abeita v. TransAmerica Mailings, Inc.,* 159 F.3d 246, 254 (6th Cir. 1998). *See also Ang v. Procter & Gamble Co.*, 932 F.2d 540, 545 (6th Cir. 1991):

> "In the boxes for marking the type of discrimination charged, Ang marked only 'national origin,' although 'race' and 'retaliation' were also listed on the [EEOC] form. Based on Ang's charge and the OCRC's determination letter which indicated that they had only investigated national origin discrimination, the district court found that Ang's failure to pursue an administrative solution before the OCRC precluded him from litigating a race discrimination claim in federal court."

Likewise here, Plaintiff's failure to check the "national origin" box when making her EEOC claim divests the Court of subject matter jurisdiction over this claim.[1] *Docket #66*, Exhibits R and T.

### C. Plaintiff's Claim of Discrimination on the Basis of National Origin is Non-Cognizable Under 42 U.S.C. §1981.

Defendant also argues that Plaintiff's claim of discrimination on the basis of

---

[1] Plaintiff checked only the "race" and "retaliation" boxes when making the EEOC complaint.

"national origin" is non-cognizable under 42 U.S.C. §1981. *Id.* at 12-13 (*citing Shah v. Mt. Zion Hospital and Medical Center,* 642 F.2d 268, 272 (9th Cir. 1981). Because the Supreme Court has held that "only claims of racial, as opposed to national origin, discrimination are cognizable under § 1981," *Amini v. Oberlin College* 259 F.3d 493, 502 (6th Cir. 2001)(*citing Saint Francis College v. Al-Khazraji,* 481 U.S. 604, 613, 107 S.Ct. 2022, 2028 95 L.Ed.2d 582 (1987)), Plaintiff's national origin claim under §1981 is subject to dismissal.

### D. Discrimination on the Basis of Race Under 42 U.S.C. §1981

Defendant arguing next that Plaintiff's §1981 claim fails on its merits, contends that she has presented neither direct nor indirect evidence to support her claim of racial discrimination. *Defendant's Brief* at 13-16.

42 U.S.C. § 1981 "prohibits intentional race discrimination in the making and enforcing of contracts involving both public and private actors.'"*Amini, supra,* 440 F.3d 350, 358 (6th Cir.2006)(*citing Christian v. Wal-Mart Stores, Inc.,* 252 F.3d 862, 867-68 (6th Cir.2001)). "The 'intent' element of the claim can be established either by direct evidence or inferentially." *Id.*; *Blalock v. Metals Trades, Inc.,* 775 F.2d 703, 707 (6th Cir.1985).

#### 1. Direct Evidence

Direct evidence "is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor"in the actions at issue. *Jacklyn v. Schering-Plough Healthcare Products Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999). In *Nguyen v. City of Cleveland,* 229 F.3d 559, 563 (6th Cir.2000), the Sixth Circuit described examples of direct evidence:

> "For example, a facially discriminatory. . . policy or a corporate decision maker's express statement of a desire to remove employees in the protected group is direct evidence of discriminatory intent."

On the other hand, isolated comments by individuals not involved in the decision-making process do not constitute direct evidence. *Weigel*, 302 F.3d at 382; *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 354 (6th Cir. 1998).

This case does not involve direct evidence. Plaintiff has offered no evidence that anyone in a decision-making position (or anyone else, for that matter), expressly stated a desire to terminate her contract based on race. Plaintiff's response to the present motion claims that she was one of only "five [B]lack-owned providers out of 209 providers servicing Defendant," later submitting a list with a hand-written star next to the purportedly Black providers. *Plaintiff's Response*, Docket #70-2, pg. 7 -15; *Docket # 77-3* at pgs. 7-12. The list is not authenticated (Plaintiff alleges that she found it in her mailbox) and even assuming its authenticity, it does not constitute direct evidence of discrimination. *Amini, supra*, 440 F.3d is applicable. In rejecting the plaintiff's argument that "direct evidence" supported the plaintiff's discrimination claim, the court noted that "[t]he racial composition of the Oberlin faculty does not lead ineluctably to the conclusion that the college considered race when eliminating the plaintiff from consideration for the position for which he applied. Such statistical evidence at most may constitute circumstantial evidence of discrimination."

**2. Indirect or Inferential Evidence**

"The burden shifting approach developed by the Supreme Court for Title VII cases in *McDonnell Douglas Corp. v. Green,*" 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) "applies to § 1981 claims." *Hines v. City of Brighton,* 539 F.Supp.2d 908, 922

(E.D.Mich.2008)(Duggan, J.). Under that framework, the Plaintiff must present a *prima facie* case of unlawful discrimination. Once she has done so, the burden shifts to the Defendant to "articulate some legitimate, nondiscriminatory reason" for taking the challenged action. *Johnson v. University of Cincinnati*, 215 F.3d 561, 573 (6th Cir. 2000).[2] If the Defendant satisfies that burden, the Plaintiff must then prove, by a preponderance of the evidence, that the proffered reason for the Defendant's actions is not the true reason, but rather a pretext for discrimination.

"In order to establish a claim for racial discrimination under section 1981, a plaintiff must plead and prove that (1) he belongs to an identifiable class of persons who are subject to discrimination based on their race; (2) the defendant intended to discriminate against him on the basis of race; and (3) the defendant's discriminatory conduct abridged a right enumerated in section 1981(a)." *Amini,* at 358; *Christian,* 252 F.3d at 871-72.

Plaintiff, an African-American, meets the first element of *prima facie* claim. The next prong is more problematic. The Amended Complaint, while alleging that Defendant's employees were "curt and demeaning" to Plaintiff when inspecting her home, does not by itself support her conclusion that their behavior was animated by racial animus. *Amended Complaint* at ¶17. Likewise, although Plaintiff alleges that the delay in receiving clients or Defendant's negligence in attending to needs of her consumers was the result of racism, she provides no support for this allegation. *Id.* at ¶¶19-20, 27, 34. Although Plaintiff alleges one of the two consumers placed in her facility (Robert Moore) exhibited "dangerous and violent behavior, had been placed with only African-American care providers". However, she supports neither her claim that Moore had exclusively African-American care providers

---

[2]This is a burden of production. *Christian*, *supra,* 252 F.3d 862, 868 (6th Cir. 2001).

or that his behavior was any more problematic than consumers assigned to white providers. *Id.* at ¶34. Nonetheless, assuming for the sake of argument that Plaintiff has met the second prong, Plaintiff's allegation that her termination by Defendant was the result of discrimination alleges the abridgement a right under 1981(a), the third prong. *Amini*, at 358.

**E. Defendant Can Establish Nondiscriminatory Reasons For Its Actions**

Defendant disputes that its actions were based on racial animus, stating first that consumers were placed in Plaintiff's facility "with her full knowledge and permission." *Defendant's Brief* at 16. Defendant, citing the affidavit of its employee, Sherilynn Kruger, notes that despite Plaintiff's claim that she was singled out for a six-month waiting period before being assigned multiple consumers, "[i]t is MORC's practice to wait at least six months following an initial placement with a family foster home provider before expanding our contract relationship, i.e., by placing additonal consumers in the home." *Docket #66*, Exhibit D at ¶44. Kruger denies that the consumers placed in Plaintiff's facility received inadequate support or medication, stating that she personally delivered the consumers' medication to Plaintiff's facility within 24 hours of their February 17, 2006 arrival at Plaintiff's facility. *Id.* at ¶¶16-17.

Moreover, the affidavit of Donna Erb, legal guardian for both of the consumers placed in Plaintiff's care, provides non-discriminatory reasons for both the removal of LaRonda Gray from Plaintiff's facility and Plaintiff's termination. Ms. Erb states that both Gray and Moore were placed in Plaintiff's group home on February 17, 2006, explaining that because the two were previously roommates, she sought to keep them together. *Id.*, Exhibit B at ¶¶12, 15. She states that she was notified on August 22, 2006 "that Plaintiff had called 911 due to an incident relating to [Moore] and that Plaintiff was refusing to take [him] back into her home." *Id.* at ¶19. Erb states that although hospital staff evaluating Moore "determined

[Moore] was not a threat to himself or others," thus discharging him, "Plaintiff adamantly refused to take [him] back into her home," requiring him to spend the night in a homeless shelter. *Id*. at ¶¶20-23. Noting that she found emergency placement for Moore in a home "owned by a Caucasian," Erb states that "[g]iven Plaintiff's refusal to take Robbie back into her home, I was concerned that [Gray] could face the same fate and I would be forced to find emergency placement for [her] too." *Id.* at ¶¶27-28. Erb concludes her affidavit by stating that in her 11 years of acting "as a guardian for developmentally disabled individuals," she "never had a situation, other than the one with Plaintiff where the foster care provider refused to house the developmentally disabled individual until a new placement could be found." *Id*. at ¶33.

Even more fundamentally, §10.4 of Plaintiff's contract with Defendant states that "[i]n the event that either Party terminates this Contract, the Provider [Plaintiff] agrees to provide continued services and supports for MORC-referred Consumers *until an alternative provider is established*." *Id.*, Exhibit S at §10.4 (emphasis added). Plaintiff's refusal to care for Moore, at least temporarily, following his hospital release, constitutes a breach of the MORC contract, providing non-discriminatory reasons for her termination.[3]

Further, Plaintiff cannot prove by a preponderance of the evidence that the proffered reasons for the Defendant's actions are not the true reasons, but rather pretexts for racial discrimination. As discussed above, Plaintiff has submitted a document, purportedly a list of MORC providers, in support of the proposition that Caucasian providers greatly

---

[3] Further, Susanne Busignani, Director of Finanacial Services for MORC states that "[b]ased on the recommendations of MORC's clinical staff and my subsequent review of the situation including the Plaintiff's refusal to allow the Consumer back into her home, I determined that Plaintiff had breached the Provider Contract and exercised MORC's termination rights." Docket #66, Exhibit C at ¶29.

outnumber African-American providers. *Id.*, Exhibit AA. However, Plaintiff, testifying that she found the list in her mailbox, also acknowledges that she herself handwrote "Black" next to the providers she believed were African-American. *Id.,* Exhibit E at pg. 196-197, 200. *Amini,* supra, 440 F.3d at 359, noting that a statistical report had not been developed "into useful direct or inferential proof" of discriminatory intent, held that "'for statistics to be valid and helpful in a discrimination case, both the methodology and the explanatory power of the statistical analysis must be sufficient to permit an inference of discrimination.'" *Rocha v. Great Am. Ins. Co.,* 850 F.2d 1095, 1101 (6th Cir.1988) (internal citations omitted). Here, because Plaintiff can vouch for neither the methodology nor authenticity of this list, the Court cannot consider it as rebuttal evidence. Likewise, an affidavit submitted by Plaintiff's facility aide Derrick Crudup contains only the general and conclusory statement that he "was a witness to the intentional neglect, discrimination, and retaliation that was demonstrated by [MORC]," but does not specify how MORC discriminated or retaliated against Plaintiff. Docket #77-2 at pg. 37 of 50. Similarly, Gwen Davis' affidavit statement that "Moore had severe behavior problems," by itself, does not rebut Defendant's proffered legitimate reasons for Plaintiff's termination.

### F. Retaliation

Lastly, Defendant contends that Plaintiff is unable to show that MORC retaliated against her for filing EEOC complaints by enforcing a six-month waiting period on multiple consumers; placing Moore in her home; removing Gray from Plaintiff's facility; or terminating her.

"[R]etaliation claims under § 1981 . . . are governed by the same legal framework as his claims under Title VII. *Frazier v. USF Holland, Inc.,* 2007 WL 2913880, *2 (6th Cir.

2007); *Wade v. Knoxville Utils. Bd.,* 259 F.3d 452, 464 (6th Cir.2001). To make out a *prima facie* case of retaliation, a plaintiff must show the following: (1) that she engaged in protected activity; (2) that her exercise of that activity was known to the defendant; (3) that the defendant took an adverse action against her; and (4) that there was a causal connection between the protected activity and the adverse employment action. *Ford v. GMC*, 305 F.3d 545, 552-53 (6th Cir. 2002).

Plaintiff's claim that MORC retaliated against her by placing Moore in her home, applying the six-month waiting practice, removing Gray, and terminating her, fail for the same reasons as her underlying claim of racial discrimination. Admittedly, Plaintiff can demonstrate that filing a charge with the EEOC was a protected (albeit misdirected) activity; that Defendant was aware of the filing; and that her termination constitutes an "adverse action." Nonetheless, as a matter of law, she is unable to show a causal connection between her complaints and the adverse actions. Plaintiff's first EEOC filing on January 10, 2006 predates Moore's placement at her facility by over one month. The theory that MORC employees and Moore's own guardian would conspire to place Moore in Plaintiff's facility simply to punish her is not only completely unsupported by evidence, but defies logic. Defendant's practice of waiting six months before assigning multiple consumers to a facility has been established by the affidavit of a MORC employee. *Docket #66*, Exhibit D at ¶44. Donna Erb has provided compelling, non-retaliatory reasons for removing Gray from Plaintiff's care. *Id.*, Exhibit B at ¶¶19-23, 27-28, 33. Plaintiff's refusal to house Moore, despite a medical finding that he was not a danger to himself or others, constitutes a material breach of her contract with MORC, providing non-retaliatory grounds for her termination.[4]

---

[4] Plaintiff cannot even establish temporal proximity between her April, 2006 EEOC and Mental Health Authority complaints and her August 23, 2006 termination. *Dixon v. Gonzales,* 481 F.3d 324, 333 (6th Cir. 2007).

The material discussed, *supra,* represents only a fraction of the evidence supporting dismissal. Defendant has presented an overwhelming case for summary judgment, supported by copious documentation. Even assuming that all of Plaintiff's factual allegations are true, she has failed to create a question of fact as to whether Defendant's actions were either discriminatory or retaliatory.

## IV. CONCLUSION

For these reasons, I recommend that Defendant's Motion for Summary Judgment [Docket #66] be GRANTED, dismissing the case with prejudice.

Any objections to this Report and Recommendation must be filed within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sullivan,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue

contained within the objections.

        S/R. Steven Whalen
        R. STEVEN WHALEN
        UNITED STATES MAGISTRATE JUDGE

Dated: August 29, 2008

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on August 29, 2008.

        S/G. Wilson
        Judicial Assistant